**SIGNED THIS: October 23, 2006**

_____
**MARY P. GORMAN**
**UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | In Bankruptcy |
| DENNIS P. McCORMICK and | ) | |
| MARCIA McCORMICK, | ) | Case No. 05-78194 |
| | ) | |
| Debtors. | ) | |

## O P I N I O N

This matter came before the Court for trial on confirmation of
the Second Amended Chapter 13 Plan ("Plan") filed on May 31, 2006
by Dennis P. McCormick and Marcia McCormick (sometimes hereinafter
"Debtors").   Confirmation is opposed by U.S. Bank, a secured
creditor.  This case and the proposed Plan raise interesting issues
regarding the use of a secured creditor's cash collateral to fund
a Chapter 13 plan, the proper classification and treatment of
student loan debt, and the feasibility of proposing a significant

-1-

"balloon" payment at the end of a Chapter 13 plan term.  Because the McCormicks have failed to properly address each of these issues, their Plan cannot be confirmed.

Debtors filed their voluntary petition under Chapter 13 of the Bankruptcy Code on October 16, 2005.[1]  The McCormicks are both 46 years of age and reside in Springfield, Illinois.  They have a daughter who is a junior in college and a son who is a senior in high school.

Mr. McCormick is self-employed and has been in the insurance business for 23 years.  He sells insurance products and securities, and his income is derived exclusively from commissions earned from such sales.  Mr. McCormick pays all of his business expenses from his commissions, including a salary and benefits for one employee. In 2003, Mr. McCormick's business grossed approximately $269,000, which netted him, after business expenses but before taxes, almost $181,000.  In 2004, the business gross was about $225,000 with approximately $129,000 distributed to Mr. McCormick.  In 2005, the business gross was again about $225,000 and the distribution to Mr. McCormick was approximately $139,000.  On his schedules filed and presented at trial, Mr. McCormick estimated that his expected annual business gross for 2006 and future years will be about

---

[1]

The Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") generally became effective with respect to cases filed on or after October 17, 2005.  Because this case was filed on October 16, 2005, BAPCPA does not apply.  All references to the Bankruptcy Code herein are to the pre-BAPCPA Code.

$243,000 and his projected annual pre-tax draw will be $152,000.

Mrs. McCormick is a nurse and works part-time for the State of Illinois reviewing disability claims. The McCormicks' 2003 income tax return shows no income earned by Mrs. McCormick. The 2004 return shows that she earned $4,417 and the 2005 return shows her earnings as $16,133. Mr. McCormick testified at trial that Mrs. McCormick now earns $1,500 gross per month.

The McCormicks' financial problems began with a failed home construction project several years ago. U.S. Bank advanced money for the project and held a first and second mortgage on the real estate involved. Although the details presented at trial were sketchy, it appears that there were significant cost overruns, and the home was ultimately sold at a substantial loss. After the sale, the deficiency amount owed to U.S. Bank was approximately $71,000. In January, 2003, U.S. Bank agreed to refinance that balance and lend an additional $90,000 to pay off the McCormicks' credit cards.

The McCormicks executed documents with U.S. Bank for a loan of $163,857.38. Monthly payments of $1,758.05 began in February, 2003, and were to continue until January 28, 2006, when the balance of $123,357.66 was due in full. The McCormicks secured this obligation by pledging Mr. McCormick's renewal commissions from his insurance business.

Notwithstanding the strain that the monthly payment to U.S. Bank placed on their budget, the McCormicks purchased a new home in

November, 2004, incurring new debt of approximately $250,000. The McCormicks' mortgage payment, including an escrow for real estate taxes and insurance, is $1,950 per month.

During the period from January, 2003, until October, 2005, when this case was filed, the McCormicks incurred over $75,000 of credit card debt. They also borrowed more than $16,000 for their daughter's education. Further, during the same time period, they failed to pay their income taxes and, at the time of filing, had liabilities to the Internal Revenue Service in the amount of $28,598 and to the Illinois Department of Revenue in the amount of $1,550.

The McCormicks owned three vehicles at the time of filing. Each month they make a $412 payment on a 1997 Mercedes and a $169 payment on a 2000 Mazda. Their 1995 Ford Explorer is free and clear of liens and is driven by their son. After filing, they purchased a fourth vehicle to be driven by their daughter. Mr. McCormick testified that his current transportation costs for the four vehicles including the installment payments are about $2,000 per month.

The McCormicks' budget shows a $260 per month payment on the student loan debt and a $525 payment for the daughter's other monthly expenses at school. Mr. McCormick testified that they will continue to incur debt in the amount of $18,000 to $20,000 this year and next year for their daughter's education. He did not discuss their plans for their son's college education.

-4-

The McCormicks' Plan proposes to pay the IRS and the Illinois Department of Revenue in full through payments to the Trustee.  The Plan also proposes a 13.4% dividend to unsecured creditors to be paid through the Trustee.  The Plan proposes direct payments on the home mortgage loan and the vehicle loans.  The Plan proposes a $1,023.40 per month direct payment to U.S. Bank with a balloon payment at the end of the Plan term.

The Court has considered the testimony presented at trial and all of the exhibits admitted into evidence.  There are numerous reasons why the McCormicks' Plan does not comply with the requirements of the Bankruptcy Code and confirmation must be denied.  Because the McCormicks will be given an opportunity to file another amended plan, the major issues which compel denial of confirmation will each be discussed.

### A. Valuation of Renewal Commissions

Mr. McCormick's principal asset consists of his renewal commissions from sales of life insurance, disability insurance, and other  insurance and investments products.  Some of these renewal commissions secure the McCormicks' obligation to U.S. Bank.  On the McCormicks' Schedule B, the renewal commissions are disclosed and valued at $150,000.  At trial, Mr. McCormick testified that the gross value of the renewal commissions is $300,000 to $350,000 and that the value continues to grow with new sales.  He further testified that the $150,000 scheduled value was "discounted."

Mr. McCormick did not explain how the value of $300,000 to

-5-

$350,000 was calculated. The Court does not know whether Mr. McCormick simply added up every possible premium which may come in from sales he has made or whether he used a "rule of thumb" or industry formula to determine a value for expected renewals. Likewise, Mr. McCormick did not explain how he "discounted" the gross value to reach the scheduled value of $150,000. The Court originally understood Mr. McCormick to refer to the discount as being for the time value of money because the renewal commissions will only be paid to him as customers actually pay their renewal premiums. Later testimony indicated, however, that other factors were considered in the discount, such as Mr. McCormick's ability to compete for his own customers to purchase new policies rather than renew old policies in the event of a forced liquidation. How and why such factors were included in the calculation was not explained in any way.

The valuation of the renewal commissions is key to the resolution of several legal issues presented in this case. The paucity of evidence on the issue of valuation limits the ability of the Court to decide these issues.

### B. Use of U.S. Bank's Cash Collateral

U.S. Bank has a secured interest in certain renewal commissions. No documents were submitted to identify the specific commissions subject to the secured interest of U.S. Bank. Mr. McCormick testified that he is authorized to write insurance and sell products through contracts with a number of different

-6-

insurance companies.  He did not testify that U.S. Bank had secured the renewal commissions from every company with whom he might possibly do business.  Thus, the Court struggles to understand, not only the total value of Mr. McCormick's renewal commissions as set forth above, but also the value of commissions upon which U.S. Bank has a lien.

Both the attorney for U.S. Bank and the McCormicks' attorney referred to the fact that new sales continue to be generated, and both seemed to assume that expected renewal commissions from such new sales are additional collateral for U.S. Bank.  Thus, both ignored the provisions of Section 552 of the Bankruptcy Code which deal with the post-petition effect of a pre-petition security interest.  Absent an express statutory provision or court order, pre-petition security interests do not attach to property acquired by the estate or a debtor after the commencement of a case.  11 U.S.C. § 552(a).  No motion has been filed in this case to change that result.  Accordingly, U.S. Bank does not have a secured interest in any commissions generated by post-petition sales and will not acquire such an interest unless the appropriate pleadings are filed and approved by the Court.

In order to use the cash collateral of U.S. Bank, Mr. McCormick must have the consent of U.S. Bank or must establish to the Court that U.S. Bank's interest in the cash collateral is adequately protected.  11 U.S.C. § 363(c)(2) & (f). The McCormicks filed this case a year ago but have not filed a Motion to Use Cash

Collateral.  U.S. Bank is well aware that Mr. McCormick is using the renewal commissions as they come in, but it has not filed a motion to prohibit or condition the use of the commissions.  Mr. McCormick testified that he tendered payments to U.S. Bank early in the case but the payments were refused.  Why U.S. Bank refused the payments is an unexplained fact in the case.  Acceptance of the payments would not have waived U.S. Bank's rights in the case and, to the extent counsel for the Bank had concerns in that area, a simple cash collateral order could have resolved such concerns. This Court can only conclude that, to date, U.S. Bank has consented to Mr. McCormick's use of cash collateral without requiring any adequate protection payments or replacement liens.

U.S. Bank's Objection to Confirmation, however, makes clear that U.S. Bank will not continue indefinitely to allow the use of its cash collateral and wants this Court to deny confirmation of the proposed Chapter 13 Plan because the Plan does not provide adequate protection of its secured interest.  In order to determine what payments will adequately protect U.S. Bank, the Court needs to know the value of its collateral and whether a replacement lien will be granted on future renewal commissions.  Further, the Court needs to know how much of the cash collateral will be received and expended during the term of the Plan.  If a replacement lien is granted, the Court needs to know the amount of new renewal commissions expected to be generated.

Mr. McCormick testified that he expected that, from the date

of trial until the end of the year, a period of approximately 5 months, $25,000 in renewal commissions upon which U.S. Bank has a lien should be received.  He also testified that, during the first six months of next year, another $37,000 in such commissions should be received.  The Plan proposes a $1,023 per month payment to U.S. Bank.  Accordingly, for the 11-month period from August, 2006, to June, 2007, the proposal is to pay $11,253 to U.S. Bank as adequate protection for the use of $62,000.  Unless Mr. McCormick is generating sizeable new commissions upon which U.S. Bank will have a replacement lien, it is difficult to see how such a payment schedule provides adequate protection.

The lack of evidence on valuation has already been discussed. The McCormicks have not sought authority to grant a lien on newly-generated renewal commissions.  Without such evidence or pleadings, the Court cannot find that U.S. Bank is adequately protected.

### C.  Liquidation Analysis

One requirement which must be satisfied in order to confirm a Chapter 13 plan is that the value of the property to be distributed under the plan to unsecured creditors must not be less than they would receive in a Chapter 7 case if the estate of the debtor were liquidated as of the effective date of the plan.  11 U.S.C. § 1325(a)(4); In re Brown, 332 B.R. 562, 568 (Bankr. N.D. Ill 2005). The lack of evidence on the value of the renewal commissions impedes the Court's analysis of this issue.

A Chapter 13 liquidation analysis is a hypothetical analysis

-9-

of what a Chapter 7 trustee would do to liquidate the estate.  In re Brennan, 208 B.R. 448, 451 (Bankr S.D. Ill. 1997).  This Court believes that a Chapter 7 trustee would ask many of the same questions that this Court is asking.  An inquiry would have to be made into exactly which renewal commissions are subject to U.S. Bank's security interest and which are not.  The value of the commissions not subject to the lien would have to be determined.  Further, a Chapter 7 trustee would consider whether there was value in the commissions subject to the U.S. Bank lien in excess of the amounts necessary to fully secure the Bank's claim.  No evidence that such an analysis has been done was presented at trial.  The Chapter 13 Plan contains no provision that requires any amounts to be paid into the Plan for the benefit of unsecured creditors by reason of a liquidation analysis.

The Debtors have proposed to pay $12,704 to unsecured creditors which they estimate will provide a 13.4% dividend.  This amount does not appear to have been calculated based on a liquidation analysis.  The explanation provided for the dividend is that the McCormicks wanted to do something for their unsecured creditors.  Although the McCormicks may be well-meaning, a more thorough legal analysis of their obligations, if any, to unsecured creditors must be conducted.  Further, because the funds which might be used to pay a dividend to unsecured creditors may be the cash collateral of U.S. Bank, this Court cannot simply accept a desire "to do something" as a basis to find such payments

-10-

appropriate.

If the McCormicks have assets which would be liquidated by a Chapter 7 trustee for a dividend to unsecured creditors, then their Chapter 13 Plan must provide a base amount to be paid to those unsecured creditors in this case. If not, then, absent a disposable income calculation which leads to a required payment to unsecured creditors, unsecured creditors will receive no dividend in this case. *See* 11 U.S.C. § 1325(b). A straightforward, objective analysis of what the McCormicks are required to pay to unsecured creditors must be done in order for confirmation to be allowed.

### D. Educational Expenses

The McCormicks' daughter is a junior in college and the McCormicks have incurred and continue to incur student loan debt to pay her educational expenses. The McCormicks also contribute to her ongoing monthly expenses. These issues raise further impediments to confirmation.

The McCormicks scheduled their pre-petition debt to the U.S. Department of Education as priority debt and proposed to pay the debt directly and in full. The Trustee did not object to the Debtors' schedules, nor to this Plan provision. The debt to the U.S. Department of Education is not, however, a priority debt. Priority debts are those specifically set forth in the Code, and student loan obligations, even those owed to the United States, are

not priority debts.  *See* 11 U.S.C. § 507.

Courts have found that Chapter 13 plans which propose to pay student loans at rates substantially higher than other unsecured debts unfairly discriminate against the other unsecured creditors and cannot be confirmed.  *See* 11 U.S.C. § 1322(a)(3); In re Belda, 315 B.R. 477, 487 (N.D. Ill. 2004); In re Brown, 162 B.R. 506 (N.D. Ill. 1993); In re Caruso, 2001 WL 34076052 (Bankr. C.D. Ill. 2001); In re Chapman, 146 B.R. 411 (Bankr. N.D. Ill. 1992).  The McCormicks' Chapter 13 Plan cannot be confirmed unless the student loan debt is treated in the same manner as other unsecured debt.

The educational expenses of their daughter raise other issues for the McCormicks.  Their budget shows that, in addition to the student loan payment, they contribute $525 per month for their daughter's expenses while she is away at school.  Mr. McCormick testified that, over and above that amount, he is incurring new student loan debt at the rate of $18,000 to $20,000 per year for her expenses.  He also testified that he contributes additional sums for her sorority expenses and that insurance proceeds he received last summer for weather-related damage to the family home were used to purchase a vehicle for her.  Although the McCormicks' desire to help their daughter is admirable, they simply cannot afford to do what they are doing for her and still honor their other obligations.  Bankruptcy is not intended to create involuntary student loans whereby creditors, in essence, finance

the education of the debtors' children.  <u>In re Henricksen</u>, 131 B.R. 467, 473 (Bankr. N.D. Okla. 1991).   This is not to say that no educational expenses or support for their daughter can be included in the McCormicks' budget.  Rather, the amounts here are excessive in view of the McCormicks' financial situation and the fact that some of the funds they are using for the expenditures are the cash collateral of U.S. Bank.

### E. Income Taxes

The McCormicks' Chapter 13 Plan proposes to pay a priority claim of the Internal Revenue Service in the amount of $28,598 for 2003 and 2004 income taxes.  Further, the McCormicks' 2005 federal tax return shows total taxes due of $23,062 with only $5,200 in estimated payments having been paid during the year.  The 2005 balance of $18,665, which includes penalties, became due after the filing of the case, and the McCormicks' budget shows a monthly installment payment of $464 for this liability.

The McCormicks' budget provides for a $2,320 per month escrow for estimated tax payments for future tax liabilities.  Although the amount seems appropriate in view of past tax returns, the Court understood Mr. McCormick's testimony to be that he had not actually been escrowing these sums.  The failure to escrow is also evident in the fact that, if Mr. McCormick had escrowed the sums monthly after filing in October, 2005, he would have had approximately $14,000 available in April, 2006, to pay toward his 2005 liability. That money was not applied on the tax return and, accordingly, the

-13-

Court can only conclude that it had not been escrowed as budgeted.

The income tax provisions of the McCormicks' Chapter 13 Plan are further complicated by the inclusion of a provision similar to a boilerplate provision found in many Chapter 13 plans in the Springfield Division of the Central District of Illinois.[2]   The provision at issue here is the following:

> 11.  The Debtors are required to turn over to the Trustee 100% of all Federal and State income tax refunds received by them during the term of the Second Amended Chapter 13 Plan, excepting only any Federal income tax refund constituting earned income credit.  The refund(s) will be added to the base amount in order to increase the percentage of payback to unsecured creditors.

This boilerplate provision raises several concerns.  First, debtors are required to present an honest statement of their income and expenses on their Schedules I and J.  Debtors who, for example, receive $5,000 income tax refunds every year are over-withholding by $400 or so each month.  Debtors may not overstate their projected income tax liability when calculating disposable income.  Further, the proper way to deal with over-withholding is not to allow a debtor to continue the over-withholding and to make up the difference later if and when a refund is received.  Rather, a more accurate estimate of the projected tax liability must be made and used to calculate disposable income.  The Court is well aware that

---

[2]
Most local Chapter 13 plans also contain a boilerplate provision requiring the debtor to supply the Trustee with copies of federal and state income tax returns when they are filed.  The Plan here does not include such a requirement, and the Trustee has raised no objection.

the calculation of a tax liability can only be precisely made after the conclusion of the tax year when all income and available deductions are known. Reasonable estimates can be made, however, based on tax guides from taxing authorities and a debtor's past experiences as disclosed by tax returns from prior years.

Second, this boilerplate provision proclaims in advance of receipt that 100% of all tax refunds are additional disposable income without any factual basis for making that determination. Certainly, if a debtor significantly over-withholds and creates a large refund, that refund may be additional disposable income. But, as set forth above, that situation should not be allowed to continue once it is brought to the attention of the Trustee. The more difficult cases arise where there is no intentional over-withholding but a significant refund is nonetheless received.

A debtor might historically have received only small refunds but then has an increase in his mortgage interest rate which increases the available deduction for that expense, for example, by $1,500. If everything else stays the same, this increased deduction might yield a refund, depending on the debtor's filing status and tax bracket, of several hundred dollars. Whatever the refund is, however, it will be only some percentage of the increased interest deduction and, therefore, even after receiving the refund, the debtor will not be made whole for this increased expense. Unless the debtor also amended his Chapter 13 plan and

-15-

reduced his plan payments to take into consideration this increased expense, the refund does not represent additional disposable income which should be paid into the plan. To the contrary, the debtor in this example has less disposable income than original projected, notwithstanding the tax refund.

Other factors can also enter into the disposable income calculation. If a debtor receives a $1,000 refund, that may seem like a significant sum, but it really equates to just $20 per week. In determining whether the $1,000 is additional disposable income, an analysis would have to be made of what other Schedule I and J data may also have changed during the year. If the debtor's utilities, transportation costs, insurance, groceries, and other expenses increased by more than $20 per week, then the $1,000 very well may not represent additional disposable income as defined by the Code. *See* 11 U.S.C. § 1325(b)(2).

Whether the receipt of a tax refund of a particular amount in a particular year represents additional disposable income can only be fairly determined by considering all relevant facts at the time of receipt. Once a provision requiring turnover of all refunds is in a confirmed plan, however, debtors must comply and will face a Motion for Rule to Show Cause when they do not comply. The issue before the Court at a Rule to Show Cause hearing is why a debtor failed to comply with a term of a confirmed plan, not whether the term should have been included in the plan in the first place.

-16-

Calculations of disposable income require a more thorough analysis, whether done initially or during the term of the plan.  Debtors are not required to include provisions in their Chapter 13 plans which concede that all future income tax refunds are additional disposable income in order to obtain confirmation of their Chapter 13 plans.

Finally, the boilerplate provision provides that, to the extent funds are paid into the Plan from tax refunds, they will be used to pay a dividend to unsecured creditors.  That requirement is improper under the facts of this case.

Unsecured creditors are protected by several provisions of the Code.  The liquidation analysis, discussed above, assures that unsecured creditors receive as much in a Chapter 13 case as they would in a Chapter 7 liquidation.  Further, if the trustee or an unsecured creditor objects, then a debtor must pay into the plan all projected disposable income for at least 36 months.  *See* 11 U.S.C. § 1325(b).  The disposable income provision does not, however, require that the disposable income paid in must be used in whole, or even in part, to pay a dividend to unsecured creditors.  Rather, the funds are distributed in accordance with the other terms of the plan and the requirements of the Code.

Here, the Debtors have significant tax liabilities which will be paid as priority claims.  Based on the numbers set forth in the current Plan, all funds paid in for at least the first 36 months

-17-

will be used to pay administrative expenses and priority claims. A plan provision which provides that, if funds come in from a tax refund, they are to be paid to unsecured claimants at the same time that funds coming in on a monthly basis are still being used to make payments on administrative and priority claims makes no sense.

The issue is further complicated here because portions - perhaps significant portions - of Mr. McCormick's income are the cash collateral of U.S. Bank. The payment of income tax liabilities associated with the receipt of the renewal commissions is clearly an appropriate expenditure to be made by Mr. McCormick from the cash collateral. Any adequate protection payment that is ultimately ordered to be made to U.S. Bank will be based, in part, on Mr. McCormick's obligation to pay taxes on the commissions received. To the extent the tax estimate turns out to be inaccurate, it can certainly be adjusted, but the adjustment will be with U.S. Bank, not the unsecured creditors. The implementation of the boilerplate provision here would violate the protections provided by the Code to U.S. Bank with respect to its cash collateral.

### F. Feasibility

U.S. Bank's principal objection to the McCormicks' Chapter 13 Plan is that it is not feasible for the McCormicks to refinance and pay off their obligation to U.S. Bank at the end of the five-year

-18-

plan term.[3]  At that time, if all plan payments have been made, the balance due to U.S. Bank will be about $105,000.

Although so-called "balloon" payments at the end of a Chapter 13 plan are not prohibited, plans which provide for the "receipt of funds from unidentified and uncertain sources during the last month of a sixty month plan must be scrutinized carefully." In re Brunson, 87 B.R. 304, 312 (Bankr. D. N.J. 1988).  One of the factors to be given consideration in such scrutiny is the equity in the property which will be sold or refinanced to obtain the funds.  Id.

This Court has previously discussed its concerns about the lack of evidence regarding the value of Mr. McCormick's renewal commissions.  The evidence is critical to determine the feasibility of any refinance in the future.  The Court must be able to make an approximation of (i) the current value of the commissions, (ii) how much of the commissions will be received and spent, and (iii) how much will be replaced by new sales during the term of the Plan. Absent that information, the Court cannot find that it is feasible to expect a new lender to refinance the debt to U.S. Bank with then-existing renewal commissions as collateral.

---

[3]

U.S. Bank raised several issues in its written objection to confirmation.  One issue - whether the Debtors are contributing all of their disposable income to the Plan for at least 36 months - is an issue which may be raised only by the Trustee or an unsecured creditor, not a secured creditor.  See 11 U.S.C. § 1325(b).

Other issues in this case also impact on feasibility. The McCormicks' failure to pay income taxes as they become due cannot continue. It is not realistic to expect a lender to extend financing if Debtors' obligations to the Internal Revenue Service have increased rather than decreased during the term of the Plan. Likewise, the McCormicks cannot continue to increase their student loan debt by $20,000 or more per year and still expect to be able to borrow more money in a few years. If the McCormicks' financial picture is worse at the end of the Plan term than it was when they started, it is unlikely that they will find a way to make the required balloon payment. This Court must be able to find that the McCormicks will be able  make all of their Plan payments including the balloon payment in order to confirm their Plan. *See* 11 U.S.C § 1325(a)(6).

Additionally, the McCormicks must control their spending in order to establish a likelihood of refinancing the U.S. Bank debt. Although the McCormicks' initial financial problems associated with the failed construction project may not have been all of their own making, their subsequent problems are clearly the result of regularly spending more than they earn. From February, 2003 - when their $90,000 of credit card debt was paid off - until the filing of this case in October, 2005, the McCormicks ran up another $75,000 of credit card debt. During approximately that same time period, they failed to pay or escrow over $50,000 of income taxes.

-20-

They apparently lived on Mr. McCormick's gross earnings rather than what should have been his net income.  Over a period of about 33 months, this resulted in spending of more than $3,700 per month for living expenses over and above what was realistically available.

Since filing their petition, the McCormicks do not appear to have changed their spending habits.  They have not escrowed the $1,023 per month payment for U.S. Bank or the $2,300 per month for taxes.  Mr. McCormick testified that it had been tough to make ends meet since filing the Chapter 13 case and that he had no funds saved.  Thus, the McCormicks are spending $3,300 per month on items not in their Chapter 13 budget and are still struggling to keep up.  These funds may be going for educational expenses of their daughter, upkeep on their four cars, or unbudgeted expenses associated with their new home.  The McCormicks can only succeed in their Chapter 13 case if they take a serious look at their spending and make the hard choices necessary to get control.

Finally, another factor in the scrutiny which must be given to balloon payment cases is the future earning capacity of the debtors.  Id.  Mr. McCormick's income is substantial, but is not enough to pay all of the McCormick's debts and their living expenses.  At trial, Mrs. McCormick did not appear, but Mr. McCormick testified that she was a nurse and in good health.  He further testified that her reason for working only part-time was that she needed to be home with the children.  This testimony is

-21-

confusing, considering that the McCormicks' daughter is away at college most of the year and works during the summers when she is home. The McCormicks' son is a senior in high school, is involved in sports after school, and also has a part-time job. Mr. McCormick's testimony about the independent activities of his children was intended to justify the expenses of four vehicles, but it also undercut his contention that his wife is able work only part-time because she must be home to care for the children. There may be other good reasons why Mrs. McCormick works on such a limited basis which were not presented at trial. The increased family income which full-time employment by Mrs. McCormick could bring would help to deal with many of the issues discussed herein. The Court will not order Mrs. McCormick to change her employment status but simply notes that it is a consideration in assessing the feasibility of the McCormicks' Chapter 13 Plan.

Based on the evidence, the Court cannot find that the McCormicks will be able to make all of their payments under the Plan. Specifically, based on their current situation, it is unlikely that they will be able to make the balloon payment to U.S. Bank as required by their Plan.

For all of the reasons set forth above, confirmation of the McCormicks' Second Amended Chapter 13 Plan is denied. The McCormicks will be granted 30 days to file a Third Amended Chapter 13 Plan.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. See written Order.

###